Good morning, Your Honors. Marnie Canadas, Federal Defender of San Diego on behalf of Mr. Estrada. May it please the Court, Your Honors, this case is about whether law enforcement may use coercive and improper tactics in a persistent attempt to obtain a confession well after an interrogation has been concluded. In this situation, the fact is that my client confessed only once he was told that he could be paid as a confidential informant for the United States government. That fact alone makes it clear that this is an inherently unreliable confession and that this Court should therefore reverse. Now, as the case law indicates, and as I've laid out in my brief, specifically in the Haynes case and in this Court's case in Leon Guerrera, it must be shown that my client was not subjected to any kind of psychological coercion or improper inducement when he did confess. Now, as I've laid out under the Miranda case, this doesn't have to amount to the third degree. Psychological coercion has permutated into many different sorts of tactics that are used by law enforcement. And as this Court found in the Echols case, subtle psychological coercion can suffice to overbear the will of a suspect. That's quoting the Tingle case. And as the Court stated in Echols, that at times can be more effective than even express threats. Now, as I mentioned in my briefs, in the Orozco case, Judge Paya has indicated that as methods used by law enforcement become more sophisticated, it is incumbent upon the courts to take a fine eye to looking at the methods that are used and still maintain that once constitutional protections are being applied. Now, in this situation, we have my client who was interrogated at the port of entry, as indicated in my excerpts of record on page 16 and in the government's brief on page 7. That interrogation was concluded, and that interrogation was put to an end by Agent Perez. Subsequent to that, he was replaced in custody. He was spoken to by INS. He's a legal permit resident, or was, so we have to assume that the fact that a detainer was charged with immigration consequences as a result of the charges was mentioned to him. Then he was told that he was taken to the jail. He's being taken to the jail in a car alone with an agent. Now, it's our contention that the agents didn't get what they wanted out of the first conversation with my client at the port of entry. So they changed the circumstances, or at least Agent Perez did. And that was when a confession was evoked. And the fact that that was the tactic used, and that my client was told he could be paid to join the team of law enforcement is extremely troubling. And that made the confession inherently unreliable and involuntary. I tell you, the difficulty I have with it is that the discussion had nothing to do about the case. It had to do with something else. And he says, after this is all over, call me and maybe we can work something out. And this is only an hour and a half of the warnings being given. How does a statement after warnings have been given, relatively short period of time, an hour and a half, talking about something that after this is all over, if you can be of some help, we use paid informers, how does that all of a sudden motivate him to confess everything? I don't quite understand that part of your argument. Right. I understand, Your Honor. I think the point is that my client is someone who, and I think this is true of most suspects, is unsophisticated in the ways of law enforcement. As indicated in the record, he is someone who doesn't have an advanced education up to a sixth grade education in Mexico. But I think what's important is that a reasonable person in his circumstance would think, I'm on my way to jail. I'm on my way to being permanently detained. This agent is telling me right now, hey, you know, we think you need to become an informant. And a reasonable person would think, this is something that could help me. He's telling me this as we're on our way to jail, and I think would reconsider the fact that perhaps he should say, well, I do know something, and that this could get him out of the situation that he's currently in, that he's on his way to be permanently detained. Was there a hearing in this case? Yes, sir. Did your client testify? He did not testify, Your Honor. So we don't know what he may have thought? We don't know specifically what he may have thought. We just have to speculate as to that. Well, Your Honor, my position is that it's reasonable that someone in his position would think, this agent, who is an agent of the federal government, is representing to me that he can arrange for me to be paid if I reveal information. And therefore, I should tell him what I know because he's willing to pay me. And I think at that precise moment when the agent He's going to pay him for the confession? Well, he's going to pay him for information, Your Honor, but I think part and parcel of that is that someone in my client's position would believe, well, where do we start with information? He's going to want to know what I know. And as a consequence of that would reveal exactly what my client revealed. But another point that I wanted to make is I think that once the agent makes that proposal to a suspect, the nature of the situation shifts and it becomes, I think, in the perception of a suspect, that this is less of an adversarial environment. That he's inviting me to kind of come over and work for him, meaning the agent. And that now, whatever I may say may not necessarily be used against me. And I cited the Jones case in my brief, which isn't binding on this Court, but I think lays out a test pretty clearly. And that is that the Court should evaluate whether someone would think that whatever their statements are going to be would not be necessarily used against them because of the nature of the environment, because of the circumstances, the attendance circumstances. These kinds of cases, a little different context, occur all the time when you get the mule and what you want to do is get the big person. And they enter into agreement saying, look, we can cut you a deal if you're willing to testify as to who is the big money man. Now, would it be your view that that would be a violation if it turned out that the testimony wasn't what they wanted, that they could then suppress all of that? Well, no, Your Honor. I mean, I think this is a bit different. I mean, my client was here that he could be paid if he cooperated. And as a result of that, that is what triggered the confession that he made. Well, you had if he cooperated after it was over and gave him some names, paid informant type of thing. Well, Your Honor, I mean, the agent did say, you know, give me a call, that sort of thing. But as we know from the record, my client responded to this proposition. My client said, well, how much do they get paid? What sort of information are you looking for? And as the agent admitted, and this is on page 62 of the excerpt of record, he initiated the conversation. And he said that he didn't believe my client. He thought my client had information. And that's why he said what he did. That's on page 64. Now, I know that the subjective intent of the agent isn't necessarily relevant, but I think it certainly gives us a context in which this conversation took place. That my client, they were going to the jail and that was the end of the story. The interrogation had been concluded. And then once they're in a car, once the environment was totally changed, once my client was alone with the agent, he was handcuffed, that's when this conversation took place. So, you know, it's our position that this is very troubling. That, you know, that because of what the agent did, that this was a psychologically coercive tactic. And subtle it may be, using the terminology of Eccles, it still was effective in evoking a confession after my client had already made his statement and that that was concluded. Do you want to reserve him? I see I have a minute left, if I could reserve that. Sure. Good morning, Your Honor. Joseph Nguyen on behalf of the United States. If I could, I would just like to respond to some of the arguments made by Ms. Canales this morning and some of those arguments are laid out in our briefs. There doesn't seem to be a big significant factual discrepancy between what we perceive the facts to have occurred. It is true our agent did initiate a conversation. It is true that the agent did talk about selling this case. And as Your Honor indicated, he talked about discussing information related to license plates and names of other cars passing in the future. And it was related to, not related to this case, but when this case was settled were the words. Additionally, we do note that, as Your Honor indicated as well, there was no declaration in this case. There was no testimony from the defendant that this is speculation. Any claims of what he thought or what he believed is purely speculation in this case. So going down to the next slide. I think the argument is that the situation has changed because now he has an offer of employment from the government. And that once the offer of employment occurs, that the voluntariness issue comes into play and perhaps needs another Miranda statement or whatever. What's your response to that? That the circumstances change now that the government has sought employment, sought to give employment to this individual? With respect to that, Your Honor, we would continue to support what the district court found in this case, which is the real issue is, as the cases indicate, including De La Pena, is a significant lapse of time. Whether or not a significant lapse of time or perhaps even change of circumstances, if we accept the defendant's arguments, was such that it negated the proper Miranda's given an hour and a half earlier at the port of entry. In this case, we would know that it is, as Your Honor indicated, only an hour and a half. Just to interrupt for a second. Let's suppose, let me take a somewhat absurd example. Let's say that the agent pulled out a contract of employment in the car and said, well, we know we do pay pretty well and you look like you're going to. And so here's a contract of employment and here's $100. You sign it, fine. And then he said, well, and he said, well, yeah, now let me tell you about what I did. Do you think that would be a different circumstance that would, regardless of the time involved? Regardless of two situations, I think that involves two situations. One being the statements themselves about being a paid informant and a paid informant regarding future ventures. One that I think Your Honor indicated was not necessarily in connection with a particular facet of this case. As the agent testified to in the record, and I think that's excerpts of the record, page 65 to 66, his hope was not in offering that the defendant become or the appellant become a paid informant in the future. His hope was not that he would reveal information about the particular case. No, but if you think you're being employed as a paid informant, then I think perhaps your attitude changes about your potential culpability for your, and certainly whether or not your statements are going to be used against you. Perhaps it could change, but the particular statements looking at the statements asked here were, or the statements made here were that we want to know information about license plates and names of cars coming over in the future. None of these statements had anything to do with the particular facts of this case. As he said earlier in his conversation, you know, maybe when this is all settled, we can talk about this. So we would say that And doesn't that provoke someone to say, okay, let's settle this right now so I can get to work for you. Perhaps in that situation he says, I want to talk about my case, I want to talk about this instance. Perhaps that would require additional Miranda. It's a bit of an unusual circumstance that doesn't apply here, because the statement that was made was, as we would call it, spontaneous. It was not in response to any particular question made by the government or the agent in particular here. And that's why we would say, as some caseloads may be. Well, the statement was likely to elicit a response of some sort. I mean, it wasn't just an observation for which he expected no response at all. And whether or not that response has to be necessarily incriminating is a different standard altogether. And it's not necessary that he made a statement It's incriminating if the government wants to use it. That's part of it, Your Honor. Also incriminating if it may have to do with his particular facts in his case. As the statement was, we were talking about names and license plates of vehicles crossing in the future. Again, as noted by the agent, talking about after this case is settled. And to that extent, we would argue that there is a This is even the functional equivalent of an interrogation. There's a case law that indicates that subtle compulsion, even if it strikes a chord, is not necessarily one that requires, that makes it necessarily insufficient or equates it to functional interrogation. When we are dealing with an involuntariness argument, does any promise directed toward leniency in this case automatically create involuntariness? You know, that's what the case law seems to indicate, Your Honor, that a promise itself or an inducement itself is not necessarily improper. It's only when that promise or inducement rises to the level of overbearing the will of the individual suspect. Well, some of the statements seem to say, and some of the statements seem to sort of just say, well, if you say to somebody, look, you know, you're facing 10 years. We'll make it one year if you confess. They seem to say that's just plain improper and invalidates the confession. Some of those case laws, especially the older case law. And some of the other case law also indicates that you simply say, if you cooperate, if you help us, we'll inform the U.S. Attorney's Office. That in itself is not improper. So there seems to be a certain level of to what extent does it cause a, I suspect, of either he cooperates or something else will really happen. Or here, we could argue and it could be stated that all the agent was doing was giving the defendant, the appellant, more information by which he could make a rational decision. It was not a question of, as she points out, Eccles, you know, either cooperate with us, help us, or else you will be facing, there's danger inherent here. You're going to have to be put in a witness protection program and you may not see your daughter. There was not kind of psychological discord within the suspect, I would argue, purely based on the statements made in this case. Okay. Any further questions? No. Thank you. Please allow me to submit. Thank you, Your Honor. Roboto? No, Your Honor. Your Honor, just first off to add to what we were discussing before, that my client had also been told at the port of entry that if he cooperated, that it could help him. And I think considering that this is already something that's been planted in his head and then he's been told he can be a paid confidential informant, it's important to consider that in the totality of the circumstances. Furthermore, Your Honors, with respect to our Miranda claim, I would just point out the Minnick case, as I did in my briefs, and I believe that this is the kind of persistent attempt that the Supreme Court was concerned with in Minnick. Now, while the facts are a little bit different in terms of whether or not my client had invoked, we still have a circumstance where an interview or an interrogation had been concluded and the agent wasn't satisfied with that. He wasn't satisfied with the statement and he admitted that that was why he said what he did to my client about that he could arrange for my client to be a paid federal confidential informant. It's really different, though. The Supreme Court and other courts have been worried about continued interrogation after a request for a lawyer or I invoke my Miranda rights, I don't want to say anything. Then you're supposed to stop questioning under the Miranda itself says so. And that's not the case when you say, no, I waive my Miranda rights, I'm willing to talk to you. That's really a different situation. That's true enough, Your Honor, and I do think that our stronger argument is the voluntariness argument, but I did want to at least address the Miranda issue and indicate that I think that the same reasoning underpinning the Minnick case and the Innis case with respect to the functional equivalent of interrogation, that kind of reasoning still does apply in this case where we have someone who has made a statement, that statement's concluded, and as I was indicating before, the circumstances are radically altered. And then in the second instance, someone does give a confession. So I think it's important to take note of that. You're a bit over time. Do you want to make any final points? No, Your Honor. I would submit with that and indicate we believe the court should Next case on the oral argument calendar, United States v. Padilla.
judges: Wallace, Canby, Thomas